UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:

Thomas M. and Mari Grabanski,                                  Bankruptcy No. 10-30902
                                                               Chapter 11
                    Debtors.
_____/

Crop Production Services, Inc.,

                    Plaintiff,

v.                                                             Adv. No. 10-7033

Thomas M. Grabanski,

                    Defendant.
_____/

**MEMORANDUM AND ORDER**

By Complaint filed November 10, 2010, Plaintiff Crop Production Services, Inc. initiated this adversary proceeding seeking a determination that Defendant Thomas M. Grabanski's obligation to Plaintiffs in the amount of $1,046,194.90, is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (4) and (6). Defendant filed an Answer on December 15, 2010, denying the allegations in Plaintiff's complaint. A trial was held on April 19, 2011.

**I. FACTUAL BACKGROUND**

This case is about unsecured credit extended to agricultural customers by a supplier for the purchase of inputs such as nutrients, fertilizers, etc. It involves one supplier that changed names numerous times but is ultimately doing business under the name Crop Production Services, Inc. (CPS). CPS extended credit to Defendant personally from 2004 through 2006 and later to G&K Farms, a partnership in which Defendant was a partner, in 2007, 2008, and 2009. This case focuses primarily on the credit extended to G&K Farms by CPS in 2009.

1

Vance Stroebel, a regional credit manager for CPS, testified as to his financial background, his employment with CPS, and his involvement with Defendant and Defendant's business. He testified he is familiar with G&K Farms and its partners Thomas Grabanski and John Keeley.

In 2004, United Agri Products, Inc. (UAP)[1] extended credit in three individual accounts for Thomas Grabanski, John Keeley (Keeley) and John Keeley's father (senior Keeley). All the accounts were on crop term repayment plans. UAP had no payment issues and all accounts were paid on time in 2004 by each individual.

In 2005, UAP again extended credit in three individual accounts for Defendant, Keeley and senior Keeley with crop term payment plans. Stroebel testified that the limits on the accounts were probably $200,000.00 or $250,000.00, and all accounts were paid on time in 2005.

In 2006, Defendant and Keeley had individual accounts. The senior Keeley did not have an account after 2005. Stroebel testified that credit limits were probably $250,000.00 or $300,000.00 on each account. Further, he testified the two accounts had no issues and were paid on time in 2006.

In 2007, UAP sales representatives informed Stroebel that the accounts were changing from individual accounts for Defendant and Keeley to one account for G&K Farms, a partnership. Defendant and Keeley were each 50% partners in G&K Farms. The new account was a crop term account and Defendant and Keeley gave personal guaranties. Stroebel testified that the G&K Farms account had no issues and was paid on time in 2007.

In 2008, UAP was purchased by CPS and renamed Agrium. Stroebel testified that CPS supplies fertilizer, seed, and chemicals and extends unsecured advances of the products. The accounts that CPS extends are either 30-day repayment accounts or crop terms, which require

---

[1] UAP provided unsecured credit for wholesale and retail agricultural customers for the purchase of nutrients, fertilizer, etc. UAP was bought by CPS in 2008.

2

repayment following harvest. In 2008, Stroebel was authorized to approve credit limits of products in the amount of $750,000.00. He testified he makes his decision to approve credit limits based on information provided to him by the customers.

Stroebel testified he was in charge of the credit decision for G&K Farms in 2008 and that G&K Farms was given a credit limit of $1,000,000.00.[2] Stroebel received his regional manager's approval for the increased credit limit. Stroebel testified that G&K Farms' final payment was a little slower for the 2008 crop year. Payment was due on December 1, 2008, and the account was paid in full on January 21, 2009. Stroebel testified he was not too worried, but a little concerned. Prices were up and crops were good.

In December 2008, CPS changed its policy as to which of its employees were authorized to terminate credit extensions. Prior to December 2008, all decisions concerning accounts were made by credit managers. After December 2008, the decision to extend credit was still with credit managers, but a salesman was also authorized to terminate credit without a credit manager's approval. Stroebel testified that in 2009, Randy Parson, a CPS salesman, played a role in lending to G&K Farms.

In 2009, Stroebel was again authorized to approve credit limits of products in the amount of $750,000.00. Stroebel testified he reviewed G&K Farms' credit application, dated February 7, 2008, when making his determination for extending credit in 2009. Stroebel testified he considered the length of operations, credit checks, and G&K Farms' 21 years in business. Stroebel received G&K Farms' updated documents, including balance sheets and crop productions, from Parsons. Stroebel testified he reviewed the cash flow statement from January 1, 2007 through January 7, 2008 for G&K Farms. He reviewed Defendant's and Keeley's balance sheets and schedules that supported the balance sheets. He testified that he considered net worth and working

---

[2] Stroebel's title changed in July 2008 to Area Credit Manager.

3

capital position as very important when making his decision because CPS extended credit on an unsecured basis. He testified that Defendant's balance sheets appeared a little "upside down" but that it was not a big deal. Stroebel also reviewed a "Keeley Grabanski Texas" balance sheet, and he admitted that he mistakenly thought it was G&K Farms' balance sheet. The Keeley Grabanski Texas balance sheet listed a purchase of land in the amount of $7,102,510.00, which Stroebel considered in his decision because it is a hard asset with equity. The Keeley Grabanski Texas balance sheet also listed cash on hand in the amount of $415,530.10. Stroebel testified this was also a positive sign in his review.

Stroebel also reviewed the balance sheet from Defendant dated December 31, 2007. Defendant's balance sheet listed total assets in the amount of $14,677,879.00, total liabilities in the amount of $7,607,121.00, and total equity in the amount of $7,070,758.00. Stroebel testified there was also an indication that Defendant had cash on hand and no creditors. The equity ratio worked out to be pretty close to 50 percent, which is a very positive number in his industry.[3] Keeley's balance sheet demonstrated equity position in the amount of $5,584,744.00 and a positive working capital.

Stroebel also reviewed year-end balance sheets from G&K Farms as a part of his decision process. He received them within a week or two of G&K Farms' final payment for the 2008 crop year on January 21, 2009, to review for the following year. Salesman Parsons supplied them to him after receiving the documents from G&K Farms. The year-end balance sheets demonstrated a working capital position with total assets of $20,456,521.00, land with a value of $17,000,000.00, and equipment with a value of $1,462,160.00. Stroebel testified that he again reviewed the equity position due to the fact that CPS is unsecured. The year-end balance sheets reflected $7,103,083.40 in equity. There was also a profit loss statement for Defendant and Keeley attached

---

[3] Equity ratio is the total equity ($14,677,879.00) divided by total assets ($7,070,758.00).

4

to G&K Farms' year-end balance sheet. Stroebel testified that again, there was a positive working capital of $131,000.00 and 85% equity.

Stroebel testified that he also reviewed a bank reference, dated February 23, 2008, in making his credit decision in February 2009. The bank reference was a revolving credit line with an allowed balance of $4,500,000.00, which allowed G&K Farms to borrow up and pay down over the course of the year. There was $925,000 left to borrow on the revolving line of credit.

Stroebel testified that the above documents were available to him in the credit decision. He further testified there was no sign of trouble in 2009 when his credit decision was made. Stroebel testified that he relies on the documents that the salesmen give him. Stroebel admitted that when he reviewed the 2009 documents he assumed Keeley Grabanski Texas was the same entity as G&K Farms. Stroebel testified he did not confirm any figures on the documentation nor did he verify who owned what land on the list of land by contacting Defendant personally. In fact, Stroebel testified he never spoke with Defendant about his application, but CPS' review policy did not require Stroebel to call Defendant.

Stroebel testified that after his review of all the documents, he decided to extend credit for the 2009 crop year and make inputs available to G&K Farms shortly after the payment for the 2008 crop year was received.

New for the 2009 crop year, CPS offered an additional lending option for its customers by utilizing third party farm credit services. CPS established a working relationship with Pro Partners, a bank that offered third party lending service for inputs. Stroebel testified that he thought G&K Farms would probably get approved pretty quickly for additional credit through Pro Partners due to its financial strength, payment history, and business relationship with CPS. Pro Partners requested two years of tax returns and premium estimate report of G&K Farms. Stroebel testified that Parsons gave him G&K Farms' loan application with Pro Partners. Stroebel packaged up the

5

Pro Partners application and documents and forwarded them to Pro Partners within a few days of receiving them. On the Pro Partners' application, total assets were listed as $20,191,972.00 and total liabilities as $13,296,738.00, demonstrating $6,895,234.00 in equity.

Stroebel testified CPS did not require the premium estimate report and tax returns that Pro Partners required for its credit extension. CPS' credit managers simply forwarded the tax returns on to Pro Partners, and Stroebel testified he did not have these documents in his possession when he completed his review of G&K Farms.

Stroebel testified that he sets all of his accounts on a tickler reminder system in order to review open accounts. G&K Farms' file was tickled for a profile review on March 8 and 9, 2009. Stroebel reviewed the account, and at that time, he had not heard back from Pro Partners as to the status of G&K Farms' application. He was a little concerned as the application seemed straight forward, but did not know Pro Partners' process since it was CPS' first year utilizing a third party farm credit service.

Stroebel testified he reconsidered his decision regarding the 2009 lending and gave a message to Parsons to collect on the outstanding balance. Notwithstanding, Parsons allowed additional inputs and products to be shipped after Stroebel's contact with him. Stroebel did not have authority over Parsons and Stroebel called Parson's division manager to stop sales to G&K Farms until Pro Partners finished their application review. Stroebel had phone discussions in March 2009 with a Pro Partners representative and learned Pro Partners determined it was not going to make advances to G&K Farms. In April 2009, Pro Partners formally denied G&K Farms' application.

A CPS statement to G&K Farms, dated May 20, 2010, shows a balance of $777,433.58. Stroebel testified this statement does not include the accruing service charge in the amount of $9,497.57 per month.

6

Stroebel testified that Defendant contacted CPS regarding a possible repayment plan. Stroebel testified that Defendant offered such a small amount as repayment, Stroebel's manager declined Defendant's payment plan.

Defendant filed a voluntary petition under Chapter 11 of the Bankruptcy Code on July 22, 2010. In its complaint, CPS seeks a determination that the balance of $777,433.58, plus monthly accruing service charges, owed by G&K Farms and personally guaranteed by Defendant, nondischargeable.

## II. CONCLUSIONS OF LAW

The statutory exceptions to discharge in bankruptcy are narrowly construed to effectuate the fresh start policy of the Bankruptcy Code. Owens v. Miller (In re Miller), 276 F.3d 424 (8th Cir. 2002). Accordingly, a creditor opposing discharge of a debt must prove the debt falls within an exception to discharge. Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993). The standard of proof for exceptions to discharge under section 523(a) is the preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 286 (1991); Simek v. Erdman (In re Erdman), 236 B.R. 904, 910 (Bankr. D.N.D. 1999). If an objecting plaintiff fails to establish every element under section 523(a), the indebtedness at issue is dischargeable. Id.

Plaintiff alleges that $1,046,194.90 is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), (2)(B), (4) and (6).

A.   11 U.S.C. § 523(a)(2)(A)

Section 523(a) of the Bankruptcy Code exempts certain debts from discharge in bankruptcy, including debts for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. 11 U.S.C. §

7

523(a)(2)(A). To establish nondischargeability under section 523(a)(2)(A), a creditor must prove by a preponderance of the evidence that:

(1) the debtor made a representation;
(2) at the time the representation was made the debtor knew it was false;
(3) the debtor subjectively intended to deceive the creditor at the time he made the representation;
(4) the creditor justifiably relied on the representation; and
(5) the creditor was damaged.

Blue Skies, Inc. v. Preece (In re Preece), 367 B.R. 647, 652 (B.A.P. 8th Cir. 2007). Where an objecting party fails to establish every element of a section 523(a)(2)(A) action, the indebtedness at issue is dischargeable. Simek v. Erdman (In re Erdman), 236 B.R. 904, 910 (Bankr. D.N.D. 1999). Exceptions to discharge are narrowly construed against a creditor and liberally in favor of the debtor to effectuate fresh start policy of the Bankruptcy Code. Merchants Nat'l Bank of Winona v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999).

1.  Representation and Falsity

Section 523(a)(2)(A) includes both false representation, which is an express misrepresentation, and false pretense, which involves "an implied misrepresentation or conduct intended to create and foster a false impression." Finch v. Finch (In re Finch), 289 B.R. 638, 643 (Bankr. S.D. Ohio 2003); Rainer Title Co., Inc. v. Demarest (In re Demarest), 176 B.R. 917, 920 (Bankr. W.D. Wash. 1995).

There is no dispute that Defendant represented to Plaintiff that G&K Farms could pay for the inputs supplied in 2009. Defendant supplied CPS with G&K Farms' application, balance sheets and schedules seeking credit from CPS for 2009. There is no evidence to suggest, however, that Defendant knew any information he provided was false at the time Defendant sought renewal of credit for inputs in 2009. Defendant had a good business relationship and good payment history

8

with CPS. There is no evidence that any information supplied to CPS was misrepresented by Defendant.

2.  Intent to Deceive

Intent may be inferred from a debtor's actions at the time of and subsequent to the loss. In re Finch, 289 B.R. at 643. A court is to "consider whether the circumstances, as viewed in the aggregate, present a picture of deceptive conduct by the debtor which indicates an intent to deceive creditor." Crawford v. Monfort (In re Monfort), 276 B.R. 793, 796 (Bankr. N.D. Ohio 2001).

Plaintiff suggests Defendant intended to deceive Plaintiffs by listing property and assets they did not own. The documents provided to Plaintiff by G&K Farms clearly stated what entity or person owned each tract of land. Stroebel admitted he interpreted the documents incorrectly and assumed "G&K Farms" and "Keeley Grabanski Texas" were the same entity. There is no evidence that Defendant misrepresented G&K Farms on any information contained in its documentation when applying for the 2009 credit extension or that Defendant intended to deceive Plaintiff by supplying a detailed document of what entity owned each parcel of land. Stroebel's own incorrect reading of the document that detailed Keeley Grabanksi Texas owned land, not G&K Farms, cannot be construed as intent to deceive on Defendant's part.

3.  Reliance and loss

As to the elements of reliance and loss, Plaintiff relied on G&K's representation that it would pay for the inputs supplied to them by CPS and suffered a monetary loss, but as stated above, there is no evidence of Defendant's intent to deceive or of his knowledge of the falsity of his representation. Further, it is quite possible the monetary loss suffered by Plaintiff was due to its own action of revoking the supply of inputs partially through a crop year. Therefore, Plaintiff's claim for nondischargeability fails under section 523(a)(2)(A).

B  11 U.S.C. § 523(a)(2)(B)

To establish nondischargeability under section 523(a)(2)(B), a creditor must prove by a preponderance of the evidence that the monetary indebtedness was obtained by use of a statement in writing--

  (i)  that is materially false;

  (ii)  respecting the debtor's or an insider's financial condition;

  (iii)  on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

  (iv)  that the debtor caused to be made or published with intent to deceive; or

In this case, there is no dispute that the loan was obtained by the use of statements in writing. However, there is no evidence that the documents provided by Defendant on behalf of G&K Farms were materially false. CPS relied on the documents provided but there is also no evidence that Defendant caused them to be made or published with the intent to deceive. Therefore, Plaintiff's claim for nondischargeability fails under section 523(a)(2)(B).

C.  11 U.S.C. 523(a)(4)

Plaintiff also alleges that Defendant's conduct constitutes embezzlement or larceny under section 523(a)(4). The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny[.]" 11 U.S.C. § 523(a)(4).

  1.  Embezzlement

Embezzlement is the "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." Belfry v. Cardozo (In re

10

Belfry), 862 F.2d 661, 662 (8th Cir. 1988). It is the subsequent possession by the debtor that becomes unlawful. Montegomery v. Montegomery (In re Montegomery), 236 B.R. 914, 922 (Bankr. D.N.D. 1999). To prove embezzlement, a creditor must prove that the debtor acted with fraudulent intent. Id. The embezzlement exception requires that a defendant improperly used the creditor's property before complying with some obligation to Plaintiff. In re Belfry, 862 F.2d at 663.

In this case, there is no evidence that Defendant acted with fraudulent intent or that Defendant improperly used Plaintiff's property before complying with some obligation to them. The embezzlement exception does not apply because Defendant's possession did not become unlawful at any point.

    2.    Larceny

Larceny is the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner. Eggelston v. Eggelson (In re Eggelston), 243 B.R. 365 (Bankr.W.D. Mo. 2000) (citing Rech v. Burgess (In re Burgess), 106 B.R. 612, 622 (Bankr. D. Neb. 1989)). The essential difference between larceny and embezzlement is the manner in which property comes into the possession of the person charged. Id. Because the original taking and possession of Plaintiff's property by Defendant was not unlawful, Defendant did not commit larceny with respect to Plaintiff's property, and the larceny exception does not apply.

Therefore, Plaintiff has not met its burden of proving that Defendant's acts were embezzlement or larceny. Plaintiff's claim for nondischargeability also fails under section 523(a)(4).

11

D.   11 U.S.C. § 523(a)(6)

The Bankruptcy Code provides that an individual debtor in a Chapter 7 case is not discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The terms "willful" and "malicious" are two distinct elements, and each must be shown to establish an exception to discharge. Porter v. Porter (In re Porter), 375 B.R. 822, 827 (B.A.P. 8th Cir. 2007). The term willful means deliberate or intentional. Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998); In re Porter, 375 B.R. at 827. The injury, and not merely the act leading to the injury, must be deliberate or intentional. Geiger, 523 U.S. at 61-62. Malice requires conduct which is targeted at the creditor, at least in the sense that the conduct is certain or almost certain to cause financial injury. Madsen v. Lease, 195 F.3d 988, 989 (8th Cir. 1999); D'Amato v. D'Amato (In re D'Amato), 341 B.R. 1, 4-5 (B.A.P. 8th Cir. 2006). Malice requires conduct more culpable than that which is in reckless disregard of the creditor's economic interests and expectancies. In re Porter, 375 B.R. at 827. A debtor acts with malice by intending or fully expecting to harm the economic interests of the creditor. Id. The debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent additional aggravating circumstances. Johnson v. Logue (In re Logue), 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003). It is the intent to cause harm to the creditor which must exist for an injury to be malicious. In re Porter, 375 B.R. at 827. To prove nondischargeability in the instant case, Plaintiffs must prove that Defendant caused (1) willful and malicious (2) injury (3) to its property.

There is no evidence in this case that Defendant's acts were deliberate or intentional in order to cause injury to Plaintiff. Plaintiff offered credit to G&K Farms for the 2009 crop year after completing its normal annual review and then abruptly revoked that credit only a few months into the season after a third party declined to extend G&K Farms additional credit. It is quite plausible that Plaintiff's revocation impacted G&K Farms' 2009 crop production and in turn,

12

negatively impacted G&K Farms' ability to pay Plaintiff. Further, there is no evidence that Defendant's acts were deliberate or intentional in order to cause injury to Plaintiff. Defendant, on behalf of G&K Farms, attempted to work out a payment plan when they could not pay CPS in full. G&K Farms did not pay CPS but it attempted to remedy the situation. Therefore, Plaintiff has not met its burden of proving that Defendant's acts were willful or malicious. Plaintiff's claim for nondischargeability also fails under section 523(a)(6).

Based on the foregoing, Plaintiff has failed to prove its claims under section 523(a)(2)(a) and (2)(b), (4), and (6) by a preponderance of the evidence. The debt owed by Defendant Thomas M. Grabanski to Plaintiff Crop Production Services, Inc. is dischargeable. The parties shall bear their own attorney's fees and costs. The Court has considered all other arguments and deems them to be without merit.

**SO ORDERED.**

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

Dated this August 18, 2011.

                                              **WILLIAM A. HILL, JUDGE**
                                              **U.S. BANKRUPTCY COURT**